RUBENSTEIN & SON PRODUCE, Inc.,
Appellant,

v.

STATE of Texas, Appellee.

No. 14860.

Court of Civil Appeals of Texas.

Dallas.

Oct. 1, 1954.

Rehearing Denied Oct. 29, 1954.

614

Clark, Coon, Holt & Fisher, Dallas, for appellant.

Henry Wade, Dist. Atty., and Julien C. Hyer and John J. Fagan, Asst. Dist. Attys., Dallas, for appellee.

CRAMER, Justice.

This action was filed by appellee State of Texas against appellant Rubenstein & Son Produce, Inc., and others, through the District Attorney, and against two lots of broken, frozen whole eggs, seeking a temporary and, on final hearing, a permanent injunction against appellant to prohibit it from moving, selling, or otherwise disposing of the eggs; and for the confiscation and destruction of such eggs found to be unfit for human consumption under Title 71, Chapter 3, R.C.S.1925, Vernon's Ann.Civ.St. art. 4465a et seq.; asserting that such eggs were below the standard in quality, purity, and strength prescribed by the statutes; that such eggs "consist in whole or in part of filthy, decomposed or putrid animal and vegetable substance and are of a poisonous and deleterious character as to render them unfit for human consumption; that they contain certain types of salmonella of the following types, to-wit: thompson, muenchen, tennessee, oranienburg and montevideo, as well as other forms of salmonella present under bacteriological tests. * * *." Also that said eggs were "adulterated as defined under Article 707 of the Penal

Code of Texas and Article 4472 of the Revised Civil Statutes of Texas."

By trial amendment appellee added that there also existed in said eggs "certain fecal coli in quantities exceeding more than 1,000,000 bacterial count in each of said cans or containers of eggs and running into several millions of such germs, bacteria and harmful cells, said count varying in numbers of millions in each of said cans or containers, that render them deleterious to human health and render said eggs poisonous and unfit for human consumption. * * *." And that therefore they are adulterated within art. 707, Penal Code, and art. 4472, R.C.S.

Appellant answered by special exceptions, general denial, admitted ownership of the eggs in question, specifically denied certain portions of the petition, asserted the State had "not pleaded in law facts which would entitle it to the relief sought," and prayed that plaintiff be denied all relief sought. Appellant also filed a motion to strike certain portions of the State's pleading. Appellee State then filed exceptions to the pleading and a general denial. On the hearing, a temporary injunction was granted. Thereafter on motion of appellant the temporary injunction was modified so as to permit the eggs to be pasteurized in an effort "to destroy any harmful filth bacteria that such eggs may now contain," under the supervision of the court's appointed officer.

After the eggs were pasteurized, the court's representative made a report that the eggs were processed under his and his agent's strict supervision, and thereafter stored in a deep freezer under guard. Application was then made by appellant, joined by others, "to modify, change, or hold for nought the temporary injunction * * *," theretofore entered, asserting the eggs were then fit for human consumption. However, before said motion was heard the case was tried on the merits without a jury, and judgment entered for the State decreeing the temporary injunction be made permanent and appellant and others be "perpetually enjoined from mov-

ing, selling or otherwise disposing of the same contrary to the provisions of this judgment * * *." Said judgment also ordered the eggs seized and destroyed and report thereof made by the Sheriff of Dallas County; but that such seizure be stayed for 60 days, or until final judgment; assessed costs against appellant, and disposed of the cause as to all other defendants.

Appellant's motion for new trial was duly overruled, and this appeal has been duly perfected. Appellant briefs eleven points of error, in four groups.

Points 1 to 5 inclusive, briefed together, are in substance: (1) The State did not properly plead its case authorizing the condemnation, confiscation, seizure and destruction of appellant's property; (2) this suit being penal in nature, the court erred in failing to require the State to meet all requirements of pleading with the same degree of certainty that is required in a bill of indictment; (3) in failing to strictly construe the State's pleading against the pleader under the same rules of certainty and specification of fact as would be required in a bill of indictment; (4) this suit being one for injunctive relief and to confiscate and destroy property, the court erred in failing to require the State to plead and show itself clearly entitled to the relief sought; and (5) in this type of suit the State's pleading must be strongly construed against it, and that rule is reinforced by the requirement that the material and essential elements which entitle the State to the extraordinary relief must be sufficiently certain to negative every reasonable inference arising from the facts so pleaded, and the trial court erred in holding to the contrary.

The material question raised by these points is whether the pleadings were sufficient as against special exceptions asserting that they did not meet the strict rules which apply to indictments in criminal cases.

The proceeding here is an in rem civil action seeking to condemn, and au-

thority to destroy, the eggs in question because they were adulterated and unfit for human consumption under arts. 706, 707, 717, etc., Penal Code, referred to and made a part of art. 4471, R.C.S. Before final judgment the State abandoned its count based on unfitness for human consumption. In our opinion our statutes above cited do not require the strictness in pleading contended for by appellant. Art. 4470, R.C.S., provides that: "Any article of food or drug that is adulterated or misbranded within the meaning of this law shall be liable to be condemned, confiscated and forfeited by a suit to be brought in the district court of the county where said article of food or drug is located, in the name of the State of Texas as plaintiff, and in the name of the owner thereof as defendant, if said owner be known; if he be unknown, then in the name of said article of food or drug, and service shall be obtained as in civil cases." It further provides that if the food or drug is misbranded or adulterated, it shall be destroyed or sold as therein provided and the proceeds, less legal costs and charges, paid into the State treasury; provides for a jury trial, etc. The term "Food" as defined in the Act, art. 4471, and the terms "adulterated" and "misbranded" are defined (by reference in art. 4472, R.C.S., to arts. 707–708 of the Penal Code).

The right of the State to regulate food is referable to its police power. 36 C.J.S., Food, § 5, p. 1051; North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195. And such right is not taken away by the fact that some value may remain for certain purposes, such value being a mere incident. 22 Am.Jur. 867–8, Food, sec. 81.

This action is one in rem against the eggs involved; the owner-claimant is made a party and given the right to a full hearing on the merits on all material controverted questions of fact, with the burden on the State to prove by a preponderance of the evidence all such disputed fact questions. Four Hundred and Forty-Three Cans of Frozen Egg Product v. United States, 226 U.S. 172, 33 S.Ct. 50, 57 L.Ed. 174.

The proceeding here is not one for penalties against the owner of the eggs, but, as said above, one under the police power of the State to condemn the eggs. In addition to the State's right to proceed directly in rem against the eggs, the State or other municipal authority involved may proceed under the penal statutes. The rule where penalties are sought against the offending parties under statutes providing such penalties, is that there is no right to recover such penalties unless clearly authorized. The theory in such prosecutions, as in all criminal prosecutions, is to administer a warning and a deterrent to the continuing disregard of the statute and as a deterrent to others. 22 Am.Jur. 866, Food, secs. 78–79. A proceeding such as the one here involved is similar in its general nature to a libel in admiralty, and the pleadings are simple and free from technical requirements. 1 Am.Jur. 597, secs. 91–92. All that is necessary by way of pleading is notice to the owner of the food unfit for human consumption. That is, that the petition state facts sufficient to advise the defendant-owner of the food, eggs here, of all material questions to be litigated. That was done in this case. Points 1 to 5 are overruled.

Points 6 and 7, in substance, assert error of the trial court (6) in granting the relief sought because the pleading did not negative or in any manner answer appellant's pleading that the eggs were entitled to move in interstate commerce; and (7) the State having established no formula of bacteria content for the standard plate count of frozen whole eggs, and the United States having entered the field of legislation and having established administration through its government agencies that permitted whole frozen eggs to move in interstate commerce as food fit for human consumption, the State of Texas was without authority to prohibit the movement of the eggs in interstate commerce, since they fell well within the formula established

by a government agency of the United States.

These points are countered that the State has authority to make regulations concerning the sale of food which is adulterated or unfit for human consumption, and to control its purity when sold within its borders, and such sales are not controlled by Federal food regulations. Such authority being within the State's police power.

The evidence which supports the judgment is, in substance: G. F. Reed, State Food and Drug Inspector, in substance, material here, testified that his first contact was on Saturday evening before the Dallas Fair was over in 1951, when a doctor out there came to him and told him he should have been out to Parkland Hospital. The next morning he went to Parkland Hospital. The patient had been removed from the house. He there learned there had been several patients ill there. He looked at the record and found they were all suffering from nausea and diarrhea, and all such patients had been given about the same treatment. That he got his laboratory report back and found the eggs and then told Mr. Rubenstein about it. He located the eggs and told the people at the warehouse. The cans he found at Alford's were identical with the cans at the Sunshine and the same kind of cans he found at Bama; that after he took these borings for test, he went to see Rubenstein and told him he had laboratory reports on the eggs and they were bad. Rubenstein said, "Well, I can't afford to lose them. I will have to go to the court about it." Reed said, "Well Sidney, since these eggs are stored in the name of Rubenstein & Son down here I will tell you I will have to file on Rubenstein & Son and Mr. Alford's warehouse." Rubenstein said, "Oh, Lord, don't do that; don't file on Rubenstein & Son. Give me a little time." Reed then said, "By 2:00 o'clock, will that be plenty of time?" Rubenstein answered "Yes." The Bama eggs and the eggs in storage were packed in the same kind of cans and labeled in the same manner. He told Rubenstein they were the same eggs and he didn't deny it. That he had occasion to be down there at early hours in the morning and watch the breaking of eggs, when they were being prepared for freezing for the Emulsol Corporation; the eggs broken down there were for Emulsol; that Emulsol kept a man there to select the eggs broken for them, and the ones that they wouldn't accept were the ones that were going over to other tables and being broken and churned and frozen and packed under Rubenstein's name. At the plant they had given them the common name of "soup." The eggs that were over at Alford's were the type that was being packed.

Dr. John L. Goforth, a graduate of Johns. Hopkins Medical School, who operates a clinical laboratory in the Medical Arts Building, Dallas, and who had taken extra courses in food poisoning and bacteriology, testified, in substance, that he had occasion to study and to be interested in food poisoning outbreaks here for a considerable time and on numerous occasions to investigate and study such outbreaks; and in answer to a hypothetical question, testified: "I would consider broken eggs, showing the findings that have been given as being contaminated in a two-way sense. First of all, I would consider that they are contaminated because of fecal contamination; and secondly, I would conclude that the presence of salmonella organisms in the fresh material made them dangerous for human consumption. * * * The coliform organisms may have no effect. They are merely evidence of fecal contamination. There are some individuals, however, that might be made sick by taking in such organisms. On the other hand, the salmonella group of organisms is very definitely a pathogenic group of organisms. I mean, by that, organisms that are capable of producing disease in the human being. * * * It would be capable of producing signs of food infection, digestive upsets, they are sometimes called. * * * Q. Doctor, what form of physical discomfort and illness and incapacity does salmonella bring about in the human anatomy if it appears in the form of a food poisoning? A. Oh, usually headaches and temperature, diarrhea and

cramping and a feeling of malease or discomfort all over the whole body, possibly vomiting at times."

Dr. Sol Haberman, employed by Baylor University College of Dentistry and Baylor University Hospital and Wadley Blood Center, in Dallas, whose position is that of Professor of Bacteriology at the Dental College, Head of Bacteriology Immunology Laboratory at Baylor Hospital, and Assistant Director and Professor of Bacteriology at Wadley Blood Center, and who has a great many degrees from various schools throughout the nation, testified on cross-examination by Mr. Holt:

"Q. * * * Well, do you know for what purpose these eggs were prepared, do you know that they are used for bakery purposes and nothing else? A. I don't know anything about these eggs; no, I have told you my experience. Q. If they are used for bakery purposes, and if they have been pasteurized, and if the temperature of a bakery product attains the Fahrenheit temperature of about 200 degrees for a period sufficient to bake a product in a bakery, wouldn't that situation kill all of the bacteria in the egg that you saw? A. No, it won't kill all of them, Counsel, it will kill, at 200 degrees, for even a very short period of time, it will kill the non-heat-resistant type, but there will still be a lot of bacteria left alive. * * *

"Q. When I spoke of temperature, I meant to use internal temperature, that is what you call in the center. * * * A. I would say that 200 for ten minutes will kill all non-resistant bacteria.

"Q. All of it? A. No, it will kill all the non-resistant bacteria.

"Q. Well, it would kill salmonella, wouldn't it? A. It would kill salmonella.

"Q. And fecal coli? A. It will kill fecal coli in its non-resistant form.

"Q. Harmless? A. No, I would not say that. There is a good deal of evidence beginning to accumulate that these are not harmless, that some of them are potentially dangerous. * *.

"Q. You know, Doctor, from your study, that all eggs, or practically all eggs contain salmonella, don't you? A. No, I don't think so. You are wrong. I do not agree with it.

"Q. Well, when I say all eggs, I mean all cans of 30-pounds, whole frozen eggs? A. Well, there are records of examinations, Counsel, where zero tests were reported—zero samples were reported positive. I have seen records of samples examined running from zero up to seventy percent of the samples examined; that is, one lot of samples, none were found positive, and another lot, as many as 70 * * *."

Dr. O. B. Williams, Professor of Bacteriology at University of Texas and Chairman of the Department of Bacteriology, in substance, material here, testified:

"Q. Did you make any determination based upon what you actually saw, yourself, and did, as to the presence of salmonella in one or more of these samples? A. We only had one sample.

"Q. I see, 1219. A. And from that one sample, I saw colonies which were identified as salmonella, yes.

"Q. All right. Now, were they few or many? A. They were a rather substantial number. * * *

"Q. * * *. Now, from your knowledge of bacteria and your background of over 30 years, and your experience with bacteriology, I will ask you to state whether in your opinion salmonella present in the quantity that you found in that sample would be harmful and dangerous to human life? A. I think they would, yes, sir. * *

"Q. Doctor, based upon your medical experience, such as you have just testified about, in observing the effect of bacteria on the human anatomy, I will ask you if in a sample of whole frozen eggs, such as is in controversy in this case, were assumed to possess the quantitative amounts as set forth in Plaintiff's Exhibit No. 2, would you consider them harmful and dangerous to human health? * * * A. I would consider that the amounts are at a dangerously high level.

"Q. And harmful and dangerous to human health if taken internally? A. They are a potential hazard, in my opinion, yes, sir."

Miss Keaton, employed by the State Department of Public Health on the 24th day of July, 1952, as bacteriologist for almost eight years and who had received a Bachelor of Science Degree from North Texas State Teachers College, and since graduation, during her eight years with the Health Department, specialized in bacteriology and in matters that had to do with it, testified that Mr. Lakey, as Chief Director of the Bureau of Foods and Drugs, at the State Health Department at Austin, brought four samples of frozen eggs, in pint jars, on or about July 24, 1952, and delivered them to her for analysis. She further testified that a copy of her analysis of the samples is attached to the statement of facts; that in sample No. 18 she found salmonella thompson and salmonella munchen, in Sub. 2 she found salmonella munchen and tennessee, and in Sub. 3 she found salmonella munchen and thompson. She further testified that the tests made by her in the laboratory were the usual and customary tests made by bacteriological people and experts, with reference to such products, to determine the quantitative and qualitative amounts of bacteria in a given commodity. She further testified that she made further tests in trying to locate the salmonella count and the fecal coliform count. The witness further testified that she did not make additional tests after the pasteurization of the eggs.

One of appellant's witnesses, an outstanding chemist, testified that after the eggs were pasteurized, he ate some of the scrambled eggs without ill effects; that all of the canned eggs had salmonella; that this State does not have a plate count standard, but the Federal government does have such a standard.

The evidence further shows that the eggs here in question were not, when seized, moving in, nor were they a part of a shipment in interstate commerce.

The weight of the evidence being for the court, the evidence in our opinion, if believed by the court, was sufficient to sustain the court's jurisdiction over the eggs in question and the court's authority under art. 4472, R.C.S., to order them destroyed, or to make such disposition of them as was consistent with our statutes, since the eggs were adulterated, as that term is used in art. 707, P.C.

The record also shows that the eggs in question were in the possession of appellant, in Dallas, Texas; that the question of the shipping of the eggs out of the State came up after the temporary injunction had been granted. Points 6 and 7 are overruled.

Points 8 and 9 assert that, (8) the State failed to meet the burden of proof to authorize it to seize, condemn, and destroy appellant's property, and (9) the court erred in condemning the eggs sampled because the evidence showed they were as good or better than the eggs ordinarily used in commerce, and as to the eggs not sampled, there is no evidence as to the condition of such eggs.

These points are countered that the State has power to make regulations for the sale and distribution of impure and adulterated food unfit for human consumption, not controlled by Federal legislation, and to regulate the sale of eggs which are adulterated or otherwise unfit for use as food under its, the State's, police power; and that art. 707, P.C., and art. 4472, R.C.S., are valid and authorized

the confiscation and destruction of the eggs here involved.

It is our opinion and we hold that it was within the police power of the State to regulate or prohibit the sale within its boundaries of food which is adulterated or unfit for human consumption, and that the evidence raised the issue of adulteration as well as that the eggs were within our legislative definition of food unfit for human consumption; also that the State had the power under the statute, to seize and destroy such adulterated eggs, and that the State did not fail to meet its burden of proof to establish such right.

The question as to whether the eggs were as good or better than eggs ordinarily used in commerce is not material here since they are condemned by our statute as adulterated; and not being in interstate commerce at the time they were seized, the right to condemn them is controlled by our Texas statutes (See note 1). Points 8 and 9 are overruled.

Points 10 and 11 assert error in the admission in evidence, (10) of a telegram to J. F. Lakey, and (11) a letter from M. W. Hale to J. F. Lakey, over the objection that they were each hearsay and deprived appellant of its right of cross-examination. The instruments involved here were as follows:

"Mr. J. F. Lakey, Director
"Bureau of Food and Drugs
"Texas State Department of Health
"Austin 1, Texas.
"Dear Mr. Lakey:
"In compliance with your request of 16 December to Colonel Ellis, I am forwarding herewith two additional copies of Military Specifications for Egg and Egg Products. I do not recall any reports of food poisoning in military personnel being traced to

salmonella in egg products. Whenever salmonella organisms are recovered from egg products which are government property, the item is withdrawn from stock and treated as inedible. Sincerely, /s/ Maurice W. Hale, Colonel VC Army Veterinarian."

"Western Union D.SAC 482 Long Govt NL PD-FS Ft. Sam Houston Tex 9

"1953 Jul 9 PM 8 23

"J. F. Lakey
"State Dept of Health Austin Tex-
"Reference your letter 7th Rubenstein frozen eggs under State seizure at Dallas. In response to his inquiry we wired attorney Holt July 8 that we could not supervise shipment these eggs to Kansas and could offer no assurance that we would sample them if shipped. We strongly oppose interstate shipment eggs adjudged adulterated under provisions of State law that parallel those of Federal law. While it would be necessary to develop our own evidence for action under federal law we believe eggs so adjudged should not be dumped on our doorstep by transportation to other states. Geo P Larrick Food and Drug Admin Dept Health Education and Welfare Washington DC 092135z."

Appellee counters points 10 and 11 that in a trial before the court without a jury, error in admitting evidence is not reversible if there is other competent evidence to support the judgment, since there is no presumption that the trial court considered the improper evidence. The objection to the evidence by appellant that the instruments were hearsay should ordinarily be overruled, since there is a presumption that the court considered only admissible evidence supporting the judgment, if, of course, there is other evidence pointed out to us. Appellant here, however, as-

---

1. There is no pleading of estoppel by appellant based on the State's agreement to permit the pasteurization of the eggs in question, and the record shows the State, after such pasteurization of the eggs, abandoned its count based on unfitness for human consumption, and based its action thereafter on adulteration alone.

serts there is no other evidence on the matters here involved to support the judgment. Appellee in its statement and argument under these points has not directed us to such evidence. Under such a situation it is not ordinarily our duty to search the record for supporting evidence. Rule 418(c), Texas Rules of Civil Procedure. However, where, as here, we have fully examined the record material to these points under other assignments (Points 6 and 7), we should not ignore what we already know from the record. Considering such evidence under points 6 and 7, the record discloses evidence sufficient to support the court's judgment without resort to the letter and telegram complained of here, and the presumption above referred to will be considered by us. The error is therefore harmless. Points 10 and 11 are overruled.

Finding no reversible error in the trial court's judgment, it is

Affirmed.